UNITED STATES DISTRICT COURT

THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE SUBPOENA DUCES TECUM TO FIVE BRIDGES ADVISORS, L.L.C., *ET AL.* | MISC. ACTION NO. 16-649 |

**MEMORANDUM IN SUPPORT OF JOINT MOTION
TO QUASH SUBPOENAS DUCES TECUM TO FIVE
BRIDGES ADVISORS, LLC AND MICHEAL YOUNGBLOOD**

Five Bridges Advisors, L.L.C. ("FBA") and Michael Youngblood respectfully submit this memorandum in support of their motion to quash the subpoenas *duces tecum* issued to them by the Stone & Youngberg Defendants ("S&Y").[1]

**I.    INTRODUCTION**

Dr. Youngblood and his firm, FBA, are engaged in the business of providing research and analytics in the area of residential mortgage backed securities ("RMBS"). Among other services, FBA provides legal expert work in many areas, including economic valuation and assessment. The subpoenas at issue arise out of claims brought by the CA Funds, a collection of pooled hedge funds, against their former investment advisor, Walter Morales and his investment firm Commonwealth Advisors, L.L.C. ("Commonwealth"), and S&Y. Stated generally, the CA Funds allege that they suffered harm when Walter Morales, Commonwealth, and S&Y engaged in a fraudulent conspiracy in 2007-2008 to conceal the declining values of the CA Funds' investments in RMBS and a Collateralized Debt Obligation ("CDO").

---

[1] "Stone & Youngberg Defendants" refers collectively to Stone & Youngberg, LLC, Anthony Guiamano, Michael Jennings, Stifel Financial Corp. and Stifel, Nicolaus & Co., Inc.

The CA Funds retained Dr. Youngblood as an expert to provide an opinion as to the economic losses sustained by the CA Funds as a result of the fraudulent conspiracy. Dr. Youngblood's expert work generally focused on the valuation of the CA Funds' RMBS and CDO investments through a discounted cash flow analysis.

On February 12, 2016, the CA Funds produced Dr. Youngblood's expert report. Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, Dr. Youngblood's 159-page report set forth the expert's opinions, and a complete list of facts, data and other materials relied upon by Dr. Youngblood in forming his opinions.[2] Further, as provided for under Rule 26(b)(4), Dr. Youngblood is scheduled to be deposed by S&Y on April 20, 2016.

On March 18, 2016, S&Y served Dr. Youngblood and FBA with subpoenas *duces tecum*. These subpoenas included requests for 16 categories of documents.[3] Many of these requests were unduly burdensome, overly broad, or sought privileged or confidential information. Additionally, much of the information requested is electronically stored information ("ESI") that is not stored in a readily accessible format.

Dr. Youngblood and FBA have gone to great lengths and incurred substantial costs to satisfy the expert disclosure requirements under the Federal Rules. S&Y's subpoenas amount to an impermissible attempt to circumvent the limits of expert discovery and subject Dr. Youngblood and FBA to additional discovery that is unreasonable, overly broad, and unnecessary.[4] Further, even assuming a subpoena was an appropriate discovery device to compel information from a retained expert, S&Y has failed to comply with its obligations under Rule 45 of the Civil Rules of

---

[2] Dr. Michael Youngblood's Expert Report (Exhibit "A")
[3] With the exception of one additional request in Dr. Youngblood's subpoena for information authored or created by Dr. Youngblood while employed at his former company, the subpoenas issued to FBA and Dr. Youngblood contain the same 16 requests. *See* Subpoena Duces Tecum to FBA (Exhibit "B") and Subpoena Duces Tecum to Michael Youngblood (Exhibit "C").
[4] Dr. Youngblood and FBA's Written Objections to S&Y's Subpoenas (Exhibit "D"), *see also,* Declaration of Michael Youngblood (Exhibit "E").

Procedure to take reasonable steps to avoid imposing undue burdens or expense on persons subject to a subpoena. Accordingly, for these reasons, this Court should grant this Motion and quash the subpoenas.

## II. LEGAL ANALYSIS

"The expert disclosure and discovery limitations of Rule 26 represent a reasoned balance between sufficient expert disclosures and unfettered expert discovery as expressed in case law and the documented discussions of the Rules Committee." *Morriss v. BNSF Ry. Co.,* 2014 WL 128393, at *6 (D. Neb. 2014). It is well-settled that the Federal Rules governing expert discovery aim to strike a middle ground by allowing for moderate discovery into the bases for an expert's opinion, while at the same time protecting a party's experts from the excessive burdens associated with general fact discovery under Rule 26(b)(1). *See ParkerVision, Inc. v. Qualcomm, Inc.,* 2013 WL 3771226, at *1 (M.D. Fla. 2013) ("Whereas the scope of expert discovery set forth in Rule 26(a)(2) and 26(b) (4) is specific and limited by the terms stated in the rule sub-parts, general fact discovery under Rule 26(b)(1) is to be broadly and liberally interpreted within its terms.").

In this case, S&Y, via a Rule 45 subpoena, attempts to circumvent the more limited scope of expert discovery, and subject Dr. Youngblood and FBA to the costly burdens of fact discovery. This approach is contrary to the Federal Rules of Civil Procedure and applicable case law. The CA Funds have completely complied with the Federal Rules by providing S&Y with Dr. Youngblood's expert report which extensively details the bases for Dr. Youngblood's opinions. Additionally, as further required under the Federal Rules, Dr. Youngblood is scheduled to be deposed by S&Y where it will be able to further probe into the sufficiency and bases of Dr. Youngblood's opinions.

Nevertheless, S&Y believes for some reason that it is entitled to more. S&Y's subpoenas seek the production of huge amounts of ESI. The process of collecting and producing the requested

ESI would involve substantial time and resources. Further, certain of the requested ESI is proprietary information. Accordingly, even if S&Y was entitled to production of this information, which it is not, the subpoenas are unreasonable and oppressive under Rule 45. For all these reasons, this Court should grant this motion and quash the subpoenas served on Dr. Youngblood and FBA.

### a. The Subpoenas Seek Information That is Not Required to Be Disclosed Under Rule 26, or in the Alternative, is Protected From Disclosure

S&Y's subpoenas seek to compel the production of information that is not required to be disclosed in Dr. Youngblood's expert report. Rule 26(a)(2)(B) sets forth those disclosure requirements, which include:

(i) a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii) the facts or data considered by the witness in forming them;

(iii) any exhibits that will be used to summarize or support them;

(iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi) a statement of the compensation to be paid for the study and testimony in the case.

S&Y's objectionable subpoena requests can be divided into two categories, both of which fall outside the scope of required expert disclosures: (1) a request for more than a million individual data elements from BlackBox Logic L.L.C. ("BlackBox"), a subscription service used by FBA; and (2) requests for any financial models used or relied on by Dr. Youngblood to reach his opinion.

In regards to this first request, BlackBox provides FBA with access to a commercially available, proprietary software which provides nationwide information on individual mortgage loans. Specifically, FBA used BlackBox data as a starting point in its analysis of RMBS—a

4

security backed by a pool of mortgage loans. In analyzing a specific RMBS, FBA used the BlackBox data base to pull information on all of the individual mortgage loans that backed the specific RMBS being analyzed. This BlackBox data included certain variables or characteristics of the individual loans, such as loan-to-value ratios and FICO scores. FBA used these variables to generate or estimate prepayment, default, and loss severity models used to assess the risk of each individual mortgage loan. These models are then generally collapsed down to a vector or assumption that estimate the likelihood that the loan will be prepaid, default, and the loss severity in the event of a default.

These vectors or assumptions (frequently also referred to as "prepayment curves," "default curves," or "loss curves") are input into a computer program called Intex for the purpose of generating cash flow projections for the RMBS being analyzed. FBA's valuations are largely derived from these projected cash flow results from Intex.

These assumptions are stored in a proprietary data warehouse maintained by FBA for the purpose of validating opinions rendered by FBA in past years, and for its forensic work, the nature of the analysis Dr. Youngblood and FBA performed in this case. The assumptions that FBA used to value the securities at issue in this case have been produced to S&Y.

These assumptions reflect the basis of Dr. Youngblood's valuation opinions, and constitute the information, which an expert would evaluate or critique FBA's analysis. By contrast, the actual BlackBox data itself—i.e. the millions of individual BlackBox data items of individual mortgage loans that were used to create FBA's models are so voluminous as to be unwieldy and would provide very little if any guidance in an expert's evaluation of Dr. Youngblood's methodology and opinions.

Courts have found that similar information is not required to be included within an expert's report. *Cook v. Rockwell Int'l Corp.*, 580 F.Supp.2d 1071 (D. Colo. 2006) involved a class action lawsuit brought by property owners who alleged that a federal weapons facility had diminished the value of their property. Plaintiffs retained an expert to assess the effect of the weapons facility on nearby property values. *Id.* at 1110. Similar to Dr. Youngblood's RMBS valuations, the expert in *Cook* performed a regression analysis which examined the effect of numerous independent variables—including individual property attributes, employment levels, demographic data, and crime and poverty, on a dependent variable—property value. *Id.* 1110-1111.

The *Cook* defendants then sought to exclude the expert report on the basis that it failed to comply with Rule 26(a)(2)'s requirement that the expert report include all facts or data relied on by the expert. *Id.* Defendants main assertion was that its own expert was not able to replicate the expert's construction of some of the variables used by the expert or to verify all of the expert's regression results. *Id.* at 1122.

The *Cook* court rejected defendants' position and found that the expert disclosures were sufficient under Rule 26(a)(2). The purpose of Rule 26(a)(2), the court reasoned, is "to eliminate surprise and provide the opposing party with enough information regarding the expert's opinions and methodology to prepare efficiently for deposition, any pretrial motions and trial." *Id.* at 1122. The court held that Rule 26(a)(2)'s notice requirement does not require disclosure of an expert's "detailed working notes, intermediate results and computer records," nor did the court find that there was "any suggestion in Rule 26(a)(2) that an expert report is incomplete unless it contains sufficient information and detail for an opposing expert to replicate and verify in all respects both the method and results described in the report." *Id.* at 1121-1122. The court in *Cook* concluded that the expert's 82-page report and other disclosures "were sufficient to enable Defendants to

depose [the expert], [and] to retain a rebuttal expert who prepared a lengthy rebuttal report analyzing and critiquing [the expert's] methodology." *Id*. at 1122.

Here, similar to the *Cook* defendants, S&Y's request for all BlackBox data elements relied on by Dr. Youngblood suggests that S&Y believes it is entitled to information sufficient to allow its own expert to replicate and verify in all respects Dr. Youngblood's analysis. This is simply not true. Rule 26(a)(2)'s main purpose is to provide notice sufficient to allow the opposing party to prepare for the expert deposition. Here, by providing S&Y with the general methodology and all assumptions or vectors that drove his valuation results, Dr. Youngblood has provided sufficient notice to allow S&Y to prepare for his deposition. *See Heller v. District of Columbia,* 952 F.Supp.2d 133, 138-139 (D.D.C. 2013) ("[Rule 26(a)(2)] contemplates that the expert will supplement, elaborate upon, [and] explain ... his report' in his oral testimony…The expert report, then, is not the end of the road, but a means of providing adequate notice to the other side to enable it to challenge the expert's opinions and prepare to put on expert testimony of its own.").

Indeed, S&Y has already produced a 79-page report from its own expert critiquing Dr. Youngblood's methodology, thus indicating that Dr. Youngblood's expert disclosures did in fact provide sufficient notice under Rule 26(a)(2).[5]

S&Y's second request for financial models used or relied on by Dr. Youngblood again seeks information that is outside the scope of Rule 26(a)(2)'s disclosures. Some courts have explicitly found that similar pricing models are not facts or data under Rule 26(a)(2). *See U.S. Bank Nat. Ass'n v. PHL Variable Life Ins. Co.,* 115 F. Supp. 3d 122 (S.D.N.Y. 2015) (holding that expert's "asset-share pricing model" used to price insurance policies was not itself facts or data); *see also, Earp v. Peters,* 2009 WL 1444707 (W.D.N.C. 2009) (holding that computer tools or

---

[5] Expert Report of Christopher S. Laursen (Exhibit "F").

software used by experts do not qualify as additional facts or data under Rule 26). Further, it is well-established that Rule 26(a)(2) does not require that the expert produce every calculation or test performed by the expert. *See e.g.*, *Flebotte v. Dow Jones & Co.*, No. Civ.A. 97–30117–FHF, 2000 WL 35539238, at *7 (D. Mass. Dec.6, 2000) ("Therefore, neither the plain language of the rule nor its purpose compels disclosure of every calculation or test conducted by the expert during formation of the report."); *In re Xerox Corp. Sec. Litig.*, 746 F.Supp.2d 402, 414 (D. Conn. 2010) ("The court concludes that it was not necessary for the [expert's] initial regression analysis to be contained in the [expert] report" that was disclosed pursuant to Rule 26(a)(2)).

In the alternative, these requests seek information that is protected work product under the Federal Rules. In 2010, Rule 26 was amended to expressly provide work product protection to "drafts of *any report or disclosure* required under Rule 26(a)(2), *regardless of the form in which the draft is recorded*." Fed. R. Civ. P. 26(b)(4)(B) (emphasis added). Here, several of S&Y's requests seek preliminary draft work involving Dr. Youngblood's calculations, and thus are requests for information that is protected from disclosure under the revised Rule 24(b)(4). *See Etherton v. Owner Ins. Co.,* 2011 WL 684592, at *2 (D. Colo. 2011) (holding that draft pages of an expert's calculations are "working notes" and thus protected work product under Rule 26(b)(4)).

### b. S&Y's Subpoenas Attempt to Circumvent the Scope of Permissible Expert Discovery Allowed Under Rule 26(a)(2) and Rule 26(b)(4)

S&Y's subpoenas seek to use Rule 45 to compel the production of information that is above and beyond the permissible scope of expert discovery. The Federal Rules provide for two mechanisms (and limits) to expert discovery: (1) mandatory expert disclosures under Rule 26(a)(2); and (2) expert depositions under Rule 26(b)(4). Courts have frequently rejected the use of a Rule 45 subpoena to bypass Rule 26(a)(2) and 26(b)(4) to obtain expert discovery beyond what is allowable under Rule 26. *See Morriss,* 2014 WL 128393, at *6 ("The court finds that absent

some threshold showing of need, the broad discovery provisions of Rules 34 and Rule 45 cannot be used to undermine the specific expert witness discovery rules in Rule 26(a)(2) and (b)(4)."); *In re Fuller*, 2013 WL 5305317 (D. Me. 2013) ("The Rules Committee's comment to the 1991 amendment of Rule 45 states clearly that the rule "*does not apply* to the expert retained by a party, whose information is subject to the provisions of Rule 26(b)(4).") (emphasis added); *Marsh v. Jackson*, 141 F.R.D. 431, 433 (W.D. Va. 1992) ("[Rule 26(b)(4)] operate[s] as a control, or brake if you will, on the potential runaway use of the subpoena duces tecum to compel the production of the evidence of experts retained by a party to testify at trial.").[6]

Here, S&Y, by way of subpoena, seeks to obtain expert discovery far beyond the limits set forth in the Federal Rules. Such requests subject Dr. Youngblood and FBA to the unreasonable burdens that the expert discovery rules clearly attempt to prevent. *See Morriss*, 2014 WL 128393, at *6 ("As referenced repeatedly in the advisory notes to Rule 26, the provisions of the rule were adopted to limit the undue burden and cost of expert discovery."). Accordingly, FBA and Dr. Youngblood should not be required to comply with the subpoenas because Rule 45 is not an appropriate method of discovery under the circumstances.

### c. The Subpoenas Should Be Quashed Under Rule 45

Even assuming Rule 45 is applicable in this case, the subpoenas should be quashed. Specifically, the subpoenas are unreasonable under the provisions of Rule 45 because they: (1) pose an undue burden; and (2) seek trade secret or confidential information.

---

[6] For additional cases applying this well-established principal that a Rule 45 subpoena cannot be used to circumvent the limits of expert discovery: *See Hartford Fire Ins. Co. v. Pure Air on the Lake Ltd.*, 154 F.R.D. 202, 208 (N.D.Ind.1993); *Greer v. Anglemeyer*, No. 3:93–CV–649RP, 1996 WL 56557, at *2 (N.D.Ind. Jan. 5, 1996); *Perry v. United States*, No. CA3:96–CV –2038–T, 1997 WL 53136, at *1 (N.D.Tex. Feb. 4, 1997); *Newcomb v. Principal Mut. Life Ins. Co.*, No. 1:07cv345, 2008 WL 3539520 (W.D.N.C. Aug. 11, 2008).

Federal Rule of Civil Procedure 45 governs the issuance of subpoenas, through which a party may seek discovery from a nonparty. In relevant part, Rule 45 requires that each subpoena "command each person to whom it is directed to…produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control…" Fed. R. Civ. P. 45(a)(1)(A)(iii).

The subpoena power under Rule 45 is tempered, however, as the Federal Rules seek to limit the burdens to nonparties associated with responding to subpoena requests. First, the party issuing the subpoena "must take reasonable steps to avoid imposing an undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(c)(1). Pursuant to Rule 45(c)(3)(A), upon timely motion, this Court "*must* quash or modify a subpoena that…requires disclosure of privileged or other protected matter, if no exception or waiver applies," or "subjects a person to undue burden." (emphasis added). Rule 45(c)(3)(B) permits this Court to quash or modify a subpoena that requires the recipient to disclose "a trade secret or other confidential research, development, or commercial information."

> i. **The Subpoenas Seek the Production of Inaccessible ESI and Therefore Pose an Undue Burden**

S&Y's subpoenas seek the production of ESI. As set forth in Dr. Youngblood's affidavit, the process of responding to certain of these ESI requests would cause FBA and its employees to expend substantial resources. Accordingly, to the extent these ESI requests pose an undue burden on Dr. Youngblood and FBA, the subpoenas should be quashed.

Rule 45(e) sets forth specific duties in responding to a subpoena for production of ESI. Specifically, the recipient of such a subpoena "need not provide discovery of ESI from sources that the *person identifies as not reasonably accessible because of undue burden or cost*." Fed. R.

Civ. P. 45(e)(1)(D) (emphasis added). The party seeking relief from the subpoena bears the burden of showing the requested ESI is not reasonably accessible. *Id.*

The seminal case that details the differences between accessible versus inaccessible ESI is *Zubulake v. U.B.S. Warburg LLC,* 217 F.R.D. 309 (S.D.N.Y. 2003). In *Zubalake*, the court reasoned that accessible ESI includes information such as online and near-line data that "is stored in a readily usable format." *Id.* at 319-320. Inaccessible ESI, on the other hand, includes information that is not "readily usable" such as back up tapes, where restoration of the information would be "time-consuming and expensive." *Id.* at 320.

Here, the BlackBox data sought by S&Y is cnot reasonably accessible because it is not stored in a readily usable format. Responding to S&Y's request would involve extracting data and compiling what Dr. Youngblood estimates to be more than 1 million data components. The extracted data would need to be uploaded to a new server which would need to be prepared, formatted, and checked for quality control. Because of the size of the data involved, Dr. Youngblood estimates that the upload would take several days. Compliance would require that FBA hire additional staff, rent additional space in a server farm, and purchase new equipment including software and hardware. Dr. Youngblood estimates the total costs incurred during this process would easily exceed one hundred thousand dollars, possibly costing several hundred thousand dollars.

The method in which the requested BlackBox data is stored, and the costly process required to collect and produce the information to S&Y clearly show that the ESI is "inaccessible" under the *Zubalake* analysis. *See also Baranski v. U.S.* 2015 WL 3505517, at *17-18 (E.D. Mo. 2015) (finding ESI inaccessible because of undue burden where production would take several weeks and costs would approximate $85,400); *Clean Harbors Envtl. Servs., Inc. v. ESIS, Inc.,* 2011 WL

1897213 (N.D. Ill. 2011) (finding data inaccessible where party was required to physically pull backup tapes from an offsite facility, load those tapes onto its system to extract certain data, and then retain a third party vendor to process, search, filter, or otherwise access 166 gigabytes of data). Accordingly, this Court should find that Dr. Youngblood and FBA have satisfied their burden under Rule 45(e) by showing that the requested ESI is not reasonably accessible because of the undue burden and costs associated with its production.

Additionally, FBA is provided access to BlackBox data pursuant to a subscription agreement with BlackBox. Under this agreement, FBA is prohibited from distributing BlackBox data to third parties. Accordingly, requiring Dr. Youngblood or FBA to comply with the request for this data would result in FBA breaching its agreement with BlackBox. Courts have quashed subpoenas in similar situations, finding that compliance would subject the recipient to an undue burden. *See Positive Black Talk, Inc. v. Cash Money Records, Inc.*, 394 F.3d 357 (5th Cir. 2004), abrogated on other grounds by *Reed Elsevier, Inc. v. Muchnik*, 130 S. Ct. 1237 (2010) (affirming quashing of subpoena of expert witness where compliance would have subjected expert to a conflict of interest); *Ebert v. C.R. Bard, Inc.*, 2014 WL 1365889, at *3 (M.D. Pa. 2014) (holding that subpoena posed an undue burden on recipient where subpoena sought proprietary information that the recipient was prohibited from disclosing under a confidentiality agreement).

        ii.     **The Subpoenas Seek to Compel Production of Trade Secrets and/or Confidential Research**

The subpoenas should further be quashed to the extent they seek confidential or proprietary information. Rule 45(c)(3)(B) provides that this Court may quash or modify a subpoena if it requires disclosure of "a trade secret or other confidential research, development, or commercial information." The nonparty resisting the subpoena bears the initial burden of showing that the subpoenaed information is "important proprietary information…[and] it has historically sought to

maintain the confidentiality of this information." *Innovative Therapies, Inc. v. Meents*, 302 F.R.D. 364, 380 (D. Md. 2014) (internal citations omitted). Once the nonparty has satisfied this burden, the burden shifts to the requesting party to show a "substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated." Fed. R. Civ. P. 45(c)(3)(B).

The request seeks access to both proprietary models and the data warehouse of variables. Such electronic tools and data were created and used by FBA in its business and are maintained as confidential and proprietary trade secrets by FBA and its employees. The request also seeks access to data, which was obtained from BlackBox Logic, pursuant to that company's standard licensing terms, and Defendants have asserted that, if Dr. Youngblood and FBA relied on the database information at any point in connection with the work resulting in Dr. Youngblood's opinions, Plaintiffs must provide access to the database. Defendants have refused to obtain a license or discuss terms for compensation for a license and any other protections in connection with the use of the data.

### d. In the Alternative, Costs Associated with Responding to the Subpoena Should be Shifted to the S&Y Parties

Although there is a general presumption that cost-shifting is not appropriate in cases involving discovery of ESI, it is well-settled that courts should consider cost-shifting where the discovery "imposes an undue burden or expense on the responding party." *Zubulake,* 217 F.R.D. at 318. Rule 45 provides even greater cost-shifting protections for discovery involving nonparties by making cost-shifting mandatory in cases where subpoena compliance causes significant expense. *See* Fed. R. Civ. P. 45(d)(2)(ii) (stating that an order directing compliance with a subpoena "must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance."); *see also Callwave Communications, LLC v. Wavemarket,*

*Inc.* 2014 WL 2918218, at *3 (N.D. Cal. 2014) ("[W]hen discovery is ordered against a non-party, the only question before the court in considering whether to shift costs is whether the subpoena imposes significant expense on the non-party. If so, the district court must order the party seeking discovery to bear at least enough of the cost of compliance...") (internal citations omitted).

In determining how much of the cost should be shifted to the requesting party, courts consider three factors: "(1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear its costs than the requesting party; and (3) whether the litigation is of public importance." *American Federation of Musicians of the United States and Canada v. Skodam Films, LLC,* 2015 WL 7771078 (E.D. Tex. 2015) (internal quotations and citations omitted).

Here, these factors weigh in favor of shifting all or substantially all of the costs of production from Dr. Youngblood and FBA to S&Y. First, expert witnesses are not considered by courts to have an interest in the outcome of litigation. *See In Re Exxon Valdez,* 142 F.R.D. 380, 383 (D.D.C.1992) (noting that the drafters of the new Rule 45 clearly intended to expand the protection for non-parties *such as disinterested experts witnesses*) (emphasis added). Next, the S&Y Defendants include Stifel Financial Corporation, a financial services company with a $1.98 billion market capitalization, and substantial and robust access to research tools and databases used in the financial services industry. Therefore, it is highly unlikely that Dr. Youngblood and FBA would be able to more readily bear the costs of production than the requesting party. Lastly, the litigation at issue is not of the sort that courts generally consider to be of public importance. *See Behrend v. Comcast Corp* ., 248 F.R.D. 84, 85–87 (D. Mass. 2008) (finding class action involving whether Comcast violated the Sherman Antitrust Act through unlawfully trying to prevent competition was a matter of public importance); *United States v. Cardinal Growth, L.P.,* 2015 WL

850230, at * (N.D. Ill. 2015) (finding litigation involving federal public agency was of public importance).

In the event this Court finds that compliance with Rule 45 is warranted despite the substantial costs, both the Federal Rules and applicable case law require cost-shifting in this case. Further, the case law addressing the degree of cost-shifting suggests that S&Y should bear the brunt, if not the entirety, of these costs. Accordingly, in the alternative to quashing S&Y's subpoenas, any and all compliance costs should be borne by S&Y.

### III.     CONCLUSION

For the reasons stated herein, the subpoenas duces tecum served by S&Y on FBA and Dr. Youngblood should be denied. In the alternative, all costs associated with responding to said subpoenas should be shifted to S&Y.

Respectfully submitted,

*/s/ Richard M. Martin, Jr.*
Richard M. Martin, Jr., DCD Bar # MS0001
Lamothe Law Firm, LLC
400 Poydras Street, Suite 1760
New Orleans, LA 70130
Telephone: (504) 704-1414
Telecopier: (504) 262-0295
E-Mail: rmartin@lamothefirm.com

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the above and foregoing pleading has this day been forwarded to the following counsel of record to this proceeding by electronic transmission, facsimile and/or by depositing same in the United States Postal Service, properly addressed and postage prepaid, this 31st day of March, 2016.

*/s/ Richard M. Martin, Jr.*
RICHARD M. MARTIN JR.  (DCD Bar #MS0001)